MARIO A. MOYA (State Bar No. 262059)
REBECCA M. HOBERG (State Bar No. 224086)
MOYA LAW FIRM
1300 Clay Street, Suite 600
Oakland, California 94612
Tel:  510.926.6521
Fax: 510.340.9055
Email: mmoya@moyalawfirm.com
        rhoberg@moyalawfirm.com

Attorneys for Plaintiff
PONY.AI, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PONY.AI, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>DIGITAL REALTY TRUST INC., a Maryland corporation; DIGITAL REALTY TRUST, L.P., a Maryland limited partnership; TELX - SANTA CLARA, LLC, a Delaware limited liability company; and DOES 1–20, inclusive,<br><br>Defendants. | Case No.:<br><br>COMPLAINT FOR:<br><br>(1) DECLARATORY RELIEF<br>(2) UNJUST ENRICHMENT<br>(3) RESCISSION<br>(4) BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING<br>(5) CONVERSION<br>(6) COMMON COUNT - MONEY HAD AND RECEIVED<br>(7) PROMISSORY ESTOPPEL<br>(8) BREACH OF CONTRACT - ACCORD & SATISFACTION<br>(9) UNFAIR/UNLAWFUL BUSINESS PRACTICES [B.P.C. §§ 17200 *et seq.*]<br><br>JURY TRIAL DEMANDED<br><br>[REDACTED PUBLIC VERSION] |

Plaintiff PONY.AI, INC. ("Plaintiff" or "Pony.ai") brings this action against Defendants DIGITAL REALTY TRUST INC; DIGITAL REALTY TRUST, L.P.; TELX - SANTA CLARA, LLC; and DOES 1-20 (collectively "Defendants" or "Digital Realty") for breach of contract, declaratory relief, and related claims.

## INTRODUCTION

1.      In January 2020, the world changed irreversibly in a manner that no one (including the parties to this dispute) anticipated or foresaw when a novel and highly-pathogenic severe acute respiratory syndrome coronavirus (SARS-CoV-2) began spreading worldwide, triggering the global COVID-19 pandemic.  To date, the pandemic has claimed the lives of over 6.3 million people, including over one million in the U.S. alone.

2.      For almost every person and every business worldwide, all best laid plans went awry in early 2020, as worldwide economic activity came to an abrupt halt when governments and society took immediate public-health measures to stop the spread of the virus.  Among the many things put on hold during this time were Pony.ai's prior plans to expand its leased server capacity at a data center colocation facility in Santa Clara that was owned, leased, and operated by Digital Realty and its related entities.

3.      While Pony.ai — an autonomous vehicle company — had signed a service order for this additional space, power, and equipment in late 2019 (which was to be delivered in phased deliveries to begin April 1, 2020), it was more than obvious to everyone involved by early 2020 that the space and leased power and equipment would not be needed.  When Pony.ai communicated that it wished to rescind the expansion order and enter a smaller service order for late 2020 or early 2021, Digital Realty gave repeated assurances to Pony.ai's representatives that the request would be processed, approved, and that a superseding service order would be forthcoming.  But Digital Realty instead started to bill Pony.ai for the space and services they agreed would be canceled.  Pony.ai made repeated inquiries about mounting invoices with added late fees that were supposed to be removed, but Digital Realty ducked and dodged the billing issue, and failed to respond.  Eventually, Pony.ai sent a formal dispute notice in October 2020 about these improper billings, but, again, Digital Realty did not respond.  It was not until

1  December 2020 when Digital Realty finally provided the superseding service order to Pony for a

2  smaller expansion to begin in 2021.

3      4.    Throughout this time, Digital Realty knew that Pony.ai wished to cancel the 2019

4  expansion service order and had assured Pony.ai that the service order would be cancelled and

5  superseded and all outstanding billing issues would be resolved.  But despite those assurances,

6  Digital Realty's authorized agents transmitted invoices for the full expansion order that had been

7  canceled, with compounding assessments of improper late fees.  And even after further

8  discussions between the companies' authorized representatives, Digital Realty attempted to hold

9  Pony.ai to the original service order for the expanded space, even though it had previously

10  agreed to rescind the order and knew that the purpose of the entire order — a large expansion of

11  Pony.ai's computing capacity and operation — had been frustrated by the COVID-19 pandemic

12  and the unprecedented global slowdown in economic activity it caused.

13      5.    When Pony.ai refused to pay the amounts in dispute and further attempted to

14  resolve the issue, Digital Realty went nuclear and resorted to drastic measures by threatening to

15  power-down Pony.ai's servers unless all disputed amounts were paid on a very short timeline.

16  To avoid irreparable damage to its business and operations, and to avoid a shutdown of the

17  company's autonomous vehicle ("AV") operations, Pony.ai was forced to pay the amount under

18  duress and under protest, reserving all rights.  The damage to the parties' relationship was

19  irreparable.  Because Pony.ai no longer believed Digital Realty to be a reliable business partner,

20  Pony.ai properly terminated the Master Agreement (including all remaining service orders) in

21  early 2022.  To this day, Digital Realty continues to improperly invoice Pony.ai for amounts it

22  claims are owed under the cancelled and superseded service order.  Accordingly, Pony.ai now

23  seeks to recover the amounts previously paid and a declaration that no further amounts are due

24  and owing to Digital Realty, in addition to other damages shown below.

25                    **THE PARTIES**

26      6.    Plaintiff PONY.AI, INC. is a Delaware corporation with its principal place of

27  business in Fremont, California.  Plaintiff Pony.ai is an autonomous vehicle technology company

28  with co-located corporate offices in Beijing, China and Guangzhou, China.

7.      Defendant DIGITAL REALTY TRUST, INC. ("DRT INC.") is a Maryland corporation with its principal place of business in Austin, Texas.  Defendant DRT INC. is a public real estate investment trust that owns, acquires, develops and manages technology-related real estate worldwide.  Defendant DRT INC. owns a controlling interest in defendant Digital Realty Trust, L.P. and various subsidiaries.  Through its controlling interests in these entities, defendant DRT INC. provides data center, colocation and interconnection solutions for customers across a variety of industry verticals.

8.      Defendant DIGITAL REALTY TRUST, L.P. ("DRT L.P."), is a Maryland limited partnership with its principal place of business in Austin, Texas.  It is the entity through which defendant DRT INC. conducts its business of owning, acquiring, developing and operating data centers.  Defendant DRT INC. has the full, exclusive and complete responsibility for DRT L.P.'s day-to-day management and control.

9.      Defendant TELX - SANTA CLARA, LLC is a Delaware limited liability company with its principal place of business in New York, New York.  Defendant telx - Santa Clara, LLC is a subsidiary of defendant DRT INC.

10.      Plaintiff is unaware of the true names and capacities, whether individual, entity, or otherwise, of the Defendants sued herein as DOES 1 to 20, inclusive, and therefore sues said Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that each of these fictitiously named Defendants is in some manner responsible for the injuries and damages to Plaintiff alleged in this complaint, either through the Defendants' own conduct or through the conduct of its agents or employees, or in some manner, and that Plaintiff's injuries alleged herein were proximately caused by each of the Defendants. All references in this complaint to "Defendant" or "Defendants" include all Defendants sued herein as DOES. Plaintiff will move for leave to amend this complaint, if necessary, to state the true names, capacities and liabilities of the DOE Defendants after they are ascertained.

<u>Agents, Co-Conspirators, Aiders & Abettors</u>

11.      At all times relevant to this Complaint, Defendants, including the fictitiously-named Defendants, and each of them, were acting as each other's agents, and were acting within

the course and scope of their agency with the full knowledge, consent, permission, authorization and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this Complaint.

12.     As members of the conspiracy alleged herein, each of the Defendants knowingly and willingly participated and acted with or in furtherance of said conspiracy, or aided or assisted in carrying out the purposes of the conspiracy, and have performed acts and made statements in furtherance of the conspiracy and other violations of law.

13.     Each of the Defendants acted both individually and in alignment with other Defendants with full knowledge of their respective wrongful conduct.  As such, the Defendants conspired together, building upon each other's wrongdoing, to accomplish the acts alleged herein.

14.     Defendants are sued herein individually and as principals, participants, and aiders and abettors in the wrongful conduct complained of and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, conspiracies, or transactions complained of herein.  The acts alleged to have been done by Defendants were authorized, ordered or done by them and their agents or representatives while actively engaged in the management of each of the Defendants' affairs.

## JURISDICTION AND VENUE

15.     This court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. §1332(a)(1), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

16.     Venue in this District is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the complaint occurred in this District.  Moreover, assignment to the San Francisco or Oakland Division is appropriate under Civil Local Rule 3-2(d) because a substantial part of the events giving rise to the claims occurred in Alameda County, California, where Pony.ai maintains its principal place of business.

17.     Pursuant to the choice of law provision in the parties' Agreement, California law governs the parties' rights and obligations in this matter.

# FACTUAL ALLEGATIONS

**A.    To Operate Safely and Effectively, Pony.ai and the Entire AV Industry Require Significant Computational and Data Processing Infrastructure.**

18.    Autonomous vehicles (AV) offer the promise of a revolutionary mode of transport that will make roadways safer, alleviate traffic congestion, and reduce harmful emissions.  In their most visionary form, AVs of the future will enable drivers and daily commuters the ability to recover lost driving time on safer, more-navigable roadways, and will dramatically reduce the number of accidents and collisions attributable to human error and carelessness.

19.    To achieve this vision, AVs require significant computational resources, both on-board and via remote computing.  The mere feat of building and operating an AV requires vast amounts of data to be stored, analyzed, and processed.  While an AV's on-board computer collects and analyzes environmental and sensory data obtained during operation and processes it via proprietary on-board computational algorithms, the vehicle also remains in constant communication with company operators and monitors for other important functionality, including additional safety precautions in the event of an emergency.  In addition, certain data collected during operations is frequently transferred to external storage for review, processing and further analysis offline, including for further testing, development, and refinement of driverless proprietary algorithms.  This data is vital in helping AV companies continually improve vehicle safety and performance.

**B.    Digital Realty Offers Data Center Infrastructure and Colocation Services To Its Customers With High Levels of Guaranteed SLA Uptime.**

20.    According to its most recent Form 10-K, Digital Realty "is a leading global provider of data center (including colocation and interconnection) solutions for customers across a variety of industry verticals ranging from cloud and information technology services, social networking and communications to financial services, manufacturing, energy, healthcare, and consumer products."

21.    Data-center colocation providers like Digital Realty allow data-intensive businesses to avoid the considerable costs, risks, and delays associated with building and

maintaining their own on-premise data centers, thereby allowing businesses to focus on their core business.  Rather than needing to design and build a data center from scratch and dealing with the related complexities of constructing an on-premises data center, its power and cooling needs, and its networking and interconnection infrastructure (including the requisition of physical space, networking hardware, personnel, on-site security, permits, and utilities), businesses worldwide increasingly rely upon leasing opportunities at data-center colocation facilities like those offered by Digital Realty.  A colocation provider like Digital Realty offers physical, secure space for companies like Pony.ai to locate and house their core information technology (IT) hardware, infrastructure, and dedicated IT personnel.  A colocation arrangement with a company like Digital Realty is often a preferable option for most businesses because it helps mitigate the costs and risks inherent to establishing and maintaining an on-premises data center (e.g., security, power, cooling, fire-suppression, facility maintenance, etc.) while ensuring continuous access to its equipment and full control over the company's own computing and networking hardware.

22.     Under the typical colocation arrangement offered by Digital Realty, the physical data center is run by another party — typically, a subsidiary like Telx-Santa Clara — who either owns or leases the building in which the physical data center is housed.  These data centers are available at various locations nationwide to allow customers the opportunity to lease dedicated physical server space at nearby locations, which minimizes network latency and ensure seamless communications with company servers and computational infrastructure, just as if the customer's physical IT infrastructure were located on-premises.

23.     Digital Realty generates most of its revenue by leasing these operating properties/data centers to customers under long-term lease agreements, which typically provide 24/7 controlled access to allotted rentable space where its customers' physical IT infrastructure can be placed, powered, networked, and maintained in an optimal climate-controlled, secured environment.  Typically, this infrastructure is installed in physical server racks, cabinets, and/or cages that are sold or leased by Digital Realty to house their clients' equipment.

24.     In addition to leasing this server space and related circuitry, Digital Realty also leases dedicated allotments of power under the same long-term lease agreements with its customers, along with assurances of the availability of the services provided at all times, including the provision of redundant power and redundant cooling for the installed equipment. The provision of power and network services by Digital Realty is usually governed by a Service Level Agreement ("SLA") that contractually guarantees an amount of available time ("uptime") that a customer's machines can expect to be available and online on a yearly basis.

> C.     **In March 2019, Pony.ai Entered into a Master Services Agreement with Digital Realty to Host the Company's Computing Hardware.**

25.     In March 2019, Plaintiff Pony.ai and Defendants entered into a Master Terms and Conditions Agreement (the "Master Agreement") and related service orders for the leasing of physical space and power to service Pony.ai's servers at Digital Realty's Santa Clara facility, which was owned by defendant Telx-Santa Clara, a Digital Realty subsidiary.  Among other things, the Master Agreement contemplated that, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████, during which time Pony.ai would be billed certain monthly recurring charges and non-recurring charges.

26.     Under the original service order in March 2019, Pony.ai █████████████████████████████████████████████████████████████.  For several months, the parties' relationship was relatively unremarkable.  After its equipment was installed, Plaintiff focused on its core business of AV development and testing and timely paid its monthly invoices for leasing server space at the Santa Clara facility.

> D.     **In Late 2019, Plaintiff Executed an Expansion Service Order for Additional Server Space To Come Online Starting on April 1, 2020.**

27.     In late-2019, representatives of Pony.ai and Digital Realty began discussions to expand Pony.ai's service capacity by an additional █ new cabinets during the second quarter of 2020.

28.    On December 13, 2019, Digital Realty issued a service order to expand Plaintiff's service capacity by an additional ▇ cabinets via ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. The service order (the "Expansion Service Order") was executed by the parties on December 30, 2019. Upon information and belief, at this time, Digital Realty knew and understood that the principal purpose of this agreement was to serve Plaintiff's expanded business operations.

29.    The Expansion Service Order contemplated that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.

30.    The Expansion Service Order also contemplated that the additional cabinet capacity purchased would be made available for power and service ▇▇▇▇▇▇▇▇. The following summarizes the ▇▇▇▇▇▇▇▇▇▇ under the Expansion Service Order, which contemplated ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇:

| ▇▇▇▇ | ▇▇▇▇ | ▇▇▇▇ | ▇▇▇ | ▇▇▇ |
|---|---|---|---|---|
| ▇▇▇ | ▇▇▇ | ▇▇ | ▇▇ | ▇▇▇▇ |
| ▇▇▇ | ▇▇▇ | ▇▇ | ▇▇ | ▇▇▇▇ |
| ▇▇▇ | ▇▇▇ | ▇▇ | ▇▇ | ▇▇▇▇ |

31.    Pursuant to this Expansion Service Order, Digital Realty would ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

1  ███████████████████████████████████████████████████

2  ███████████████████████████████.

3  **E.    The COVID-19 Pandemic in Early 2020 Changed Everything, and Caused**
**Pony.ai To Rescind the Expansion Order Before First Delivery.**

4

5      32.    Due to escalating concern that COVID-19 was spreading worldwide and resulting

6  government lockdowns and travel restrictions, it was necessary for Pony.ai to cancel the planned

7  expansion order for ██ new cabinets because of global economic conditions, for the health and

8  safety of its employees, and because of the uncertain impact the pandemic would have on future

9  operations.

10     33.    On February 24, 2020, an authorized representative of Pony.ai provided

11 reasonable notice to Digital Realty that, due to the economic uncertainty resulting from COVID-

12 19, the company needed to make changes to its prior order.  The representative informed

13 Defendants that Pony.ai would not be moving forward with the space expansion set to occur on

14 April 1, 2020.  Digital Realty acknowledged Pony.ai's request to cancel and renegotiate a lesser

15 scope of its original expansion order and escalated the request to a company Sales Director for

16 processing.

17     34.    In late March 2020, a senior engineer at Pony.ai was informed that Digital Realty

18 was in the process of continuing work on the expansion and had begun installation services to

19 implement the cabinet expansion despite its prior acknowledgment of the cancellation request.

20 The engineer immediately contacted Digital Realty representatives by phone and email to remind

21 them of the prior cancellation request resulting from the COVID-19 pandemic and, again,

22 unambiguously informed them that Pony.ai was canceling the expansion order.  She informed

23 them that Pony.ai would not be installing any new servers in any new expansion space, that the

24 expansion project had been postponed indefinitely, and that Digital Realty should stop all work

25 on the expansion project.  Again, Digital Realty acknowledged their understanding that the

26 expansion was not going forward and advised that they would be in touch regarding next steps.

27     35.    Despite having acknowledged Pony.ai's request to cancel the current expansion

28 order, Pony.ai received an invoice from Digital Realty for costs of services relating to the

postponed expansion.  Pony.ai contacted Digital Realty immediately to dispute the invoice.  In response, Digital Realty assured Pony.ai that the issue would be taken care of and told them they had "put in place…a process to address any customer business issues related to COVID19."

36.    For months, Digital Realty repeatedly promised and assured Pony.ai on multiple separate occasions that the billing issue would be resolved imminently, and that the cancellation request was being, and would be, processed by Digital Realty.  For example, in response to a May 15, 2020 inquiry by Pony.ai asking for the updated contract, Digital Realty provided firm assurances that the cancellation request from February 2020 was forthcoming, stating: "[s]orry for the delay on this one.  We've had several of these requests working through our system.  That being said, *I should have a change order in your hands by Monday*."  (Emphasis added.)  Further assurances were given on May 19 and May 20, 2020, when Digital Realty told Pony.ai that "[t]he documents are moving through our internal systems today and I expect to have them tomorrow, *it's basically the same SO [service order] that was signed at the end of last year with new dates and language that supersedes the previous SO*."  (Emphasis added.)  On May 21, 2020, Digital Realty's representative apologized for the delay and again reassured Pony.ai by email that "[i]t looks like I will finally have the revised SO to you tomorrow."

37.    At no time did these representatives of Digital Realty — who were the same persons who had negotiated and signed the expansion order — inform Pony.ai that its cancellation notice was improper, that the request needed to be sent via alternate channels, or that the work would be performed anyway and the request would not be honored.  In fact, Digital Realty communicated on multiple occasions that the request was being processed and that a new service order would be generated that would supersede the prior expansion order.

38.    At all times, Pony.ai relied on those promises and assurances in good faith and continued to discuss a revised scope of cabinet expansion services with Digital Realty, later settling on February 2021 as the new expansion services commencement date and revised scope of ███ cabinets, instead of ██████.  In a conference call on August 25, 2020, Pony.ai and Digital Realty were in agreement that (i) the expansion services from the December 2019 Expansion SO were not completed by Digital Realty and were not available for use by Pony.ai at

that time, and (ii) that Digital Realty would finally process Pony.ai's cancellation of the December 2019 Expansion SO. Despite these further promises and assurances, Digital Realty continued to improperly bill Pony.ai for the expansion services that were canceled by Pony.ai, and never delivered by Digital Realty, and failed to resolve the issue.

39.    In the months that followed, Pony.ai and Digital Realty exchanged dozens of emails in which Pony.ai again continuously pressed Digital Realty to process the February 2020 cancellation request and resolve the billing issue. Even though the amount in dispute was now climbing at an alarming rate — approximately $_____ each month the issue remained unresolved — Digital Realty did not appear to express much urgency in resolving its customer's requests. On October 8, 2020, Pony.ai sent a formal Dispute Notice pursuant to the Master Agreement. Although the Master Agreement provides _____ _____, Digital Realty never responded to the Dispute Notice.

40.    The service order for the modified expansion services was eventually generated and executed in December 2020. Beginning in February 2021, Digital Realty completed the ___ cabinet expansion installation, supplied power to the ___ additional cabinets, and Pony.ai began using the ___ additional cabinets.

F.    **When Pony.ai Refused to Pay The Disputed Amounts, Digital Realty Threatened to Shut Off Service, Which Raised Immediate Operational Concerns and Forced Pony.ai to Pay Under Protest and Under Duress.**

41.    On July 19, 2021, representatives of Pony.ai sent correspondence to Digital Realty's authorized representatives setting forth a history of the parties' dispute and demanding that the Expansion Service Order be canceled as was originally the parties' intention in early 2020.

42.    On August 7, 2021, Digital Realty sent correspondence to Pony.ai that escalated the dispute and, among other things, stated that Digital Realty's position was that Pony.ai had no present ability to cancel the Expansion Service Order. After receiving the August 7, 2021 correspondence from Digital Realty, Pony.ai continued communications in an attempt to see if the parties could reach a resolution of the dispute.

43.     On October 13, 2021, the parties arrived at impasse, and Digital Realty served Plaintiff with a notice of breach under the Master Agreement and communicated to Plaintiff that payment was immediately due on the full amount claimed by Digital Realty, and that Ponly.ai's failure to pay this amount would result in action taken against Pony.ai's servers and other property located in its leased space, including a disruption to available power supply and removal of equipment.  The letter clearly stated that Plaintiff's failure to pay would result in "suspension of services (including suspension of power to the Licensed Area), restricting Pony's access to the Licensed Area, restricting Pony's right to remove equipment from the Licensed Area, and termination of the agreement."

44.     This correspondence threatened to immediately shut down Pony.ai's business on an abrupt timeframe that provided no opportunity for the company to make suitable alternate arrangements for its hosted equipment and computing resources, or any meaningful chance for the company to mitigate any harm that would have resulted in the event of an abrupt shutdown. Because Pony.ai's U.S. operation relied upon the computing and IT-infrastructure located in the Santa Clara data center, the practical implications of an abrupt shutdown would have been disastrous.  Digital Realty's threat to power-down Pony.ai's servers and take them offline was a clear threat to cause immediate and irreparable business disruption to Pony.ai.  The company would have been unable to conduct its business, in the ordinary course of business, without access to its networked computing resources located at Defendants' facilities.  More importantly, an uncontrolled and unexpected power-down event could have created a shutdown event in the company's AV operations.

45.     At this point, it became clear to Pony.ai that Digital Realty was not a reliable business partner and could not be trusted to act in its customers' best interests.  Because Digital Realty, a publicly-traded data colocation company, was so quick to escalate a simple billing dispute into threats of irreparable reputational and financial harm to a reputable customer like Pony.ai, executives at Pony.ai quickly concluded that Digital Realty would stop at nothing to use any leverage it had over the company to inflict maximum financial harm on Pony.ai until the disputed amounts were paid.  For this reason, litigation was not a practicable option at that time

since Pony.ai's operations were still located and housed on premises that were owned, operated, and ultimately controlled by Digital Realty, and the risks of sabotage or other operational interruptions were too significant to ignore.

46. Pony.ai was left with no choice but to pay this money in order to protect its business interests and its ongoing operations. It was impossible to safely migrate the company's servers and IT-infrastructure to a new colocation provider before the deadline for payment demanded in Digital Realty's October 13 letter, and Pony.ai was left with no choice but to pay the disputed amounts under duress with a reservation of rights.

47. On November 3, 2021, Pony.ai tendered the amount immediately demanded by Digital Realty with correspondence indicating that the payment was being delivered in protest and under the threat of severe economic duress. Attached hereto as Exhibit A is a true and correct copy of the correspondence that Pony.ai sent to Digital Realty with payment of the disputed amounts under protest.

48. In early 2022, Pony.ai properly terminated the Master Agreement (and all remaining service orders) and removed its property from Digital Realty's premises. Digital Realty continues to demand payment from Pony.ai for amounts it claims are owed, including late fees and penalties.

## FIRST CAUSE OF ACTION
### Declaratory Relief
### (*Against All Defendants*)

49. Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 48 as though fully set forth herein.

50. An actual, present, and justiciable controversy has arisen between Plaintiff and Defendants concerning their respective rights under their contractual agreements, including but not limited to the Master Agreement and all subsequent Service Orders, including the Expansion Service Order executed in December 2019.

51. Under Civil Code § 1689(a), Commercial Code § 10208, and other applicable law, Plaintiff is entitled to a declaration that the Expansion Service Order was properly rescinded

1   by mutual agreement of the parties.

2        52.   Under the doctrines of frustration of purpose and commercial impracticability,

3   Plaintiff was excused from performance under the Expansion Service Order and was entitled to

4   rescission of the Expansion Service Order when it communicated its desire to cancel the

5   Expansion Service Order before April 1, 2020; and Plaintiff was not in breach of its agreement

6   with Digital Realty for withholding payment of the amounts charged to it pursuant to the

7   Expansion Service Order, in addition to all late fees and penalties assessed thereto.

8        53.   Plaintiff also seeks a declaration that, pursuant to Civil Code § 1521, the

9   Expansion Service Order was extinguished by accord and satisfaction because Digital Realty

10   agreed to accept, in lieu of and in satisfaction of the Expansion Service Order, a modified

11   expansion order of fewer cabinets (█ instead of █) with a later start-date (February 2021).

12        54.   Plaintiff also seeks a declaration that (i) the amounts it previously paid under

13   protest to Defendants in November 2021 were paid involuntarily under duress, coercion, and/or

14   compulsion; (ii) such payment was made under protest in order to protect Plaintiff's property and

15   business interests, even though the amount paid was not owed; and (iii) under principles of

16   equity and good conscience, Defendants should not retain the amounts previously paid under

17   protest, which should be refunded to Plaintiff.

18        55.   Plaintiff also seeks a declaration that the terms of the Master Agreement imposed

19   an unlawful late fee of ██████ assessed on all monthly recurring charges that were not

20   paid within █████ when due:



27   Master Agreement § 2.5. This late-fee provision operates as an unlawful liquidated damages

28   clause under California Civil Code § 1671(b) because it was unreasonable under the

circumstances existing at the time the contract was made and because the specified late fee is disproportionate to the actual damages that would be incurred as a result of any late payment. A three percent monthly late fee bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. To the extent that Pony.ai has been charged this late fee and has paid it in protest, all such charges should be canceled and all such payments should be refunded to Plaintiff.

56.    Plaintiff also seeks a declaration that Defendants failed to mitigate any alleged damages caused by Plaintiff's refusal to pay disputed amounts under Expansion Service Order; that Defendants failed to do everything reasonably possible to minimize any resulting loss to it or to reduce any damages for which it believed Plaintiff was liable; and that Defendants failed to act reasonably, with due diligence, and in good faith toward Plaintiff in mitigating any alleged damages; and that, as a result, Defendants are not entitled to compensation for any alleged damages that they could have avoided by their reasonable efforts and without undue expense.

57.    Accordingly, Plaintiff is entitled to a declaration that it was not in breach of the Agreement relating to the Expansion Service Order, that it was entitled to rescission of the Expansion Service Order, that all amounts previously paid under protest in November 2021 should be refunded to it, and that no amounts are currently due and owing under the Expansion Service Order.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SECOND CAUSE OF ACTION
### Unjust Enrichment
### (*Against All Defendants*)

58.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 57 as though fully set forth herein.

59.    By their wrongful acts and omissions, Defendants, and each of them, were unjustly enriched at the expense of and to the detriment of Plaintiff or while Plaintiff was unjustly deprived.

60.    Plaintiff has conferred a benefit upon Defendants to which they are not entitled,

1  specifically all payments made pursuant to the Expansion Service Order that Plaintiff attempted

2  to cancel in early 2020, including all monthly recurring and non-recurring charges and other fees

3  assessed under the canceled Expansion Service Order. Defendants have knowledge of this

4  benefit, have wrongfully and deceptively obtained this benefit, and have voluntarily accepted and

5  retained benefits conferred upon them.

6      61.    Defendants will be unjustly enriched if allowed to retain such funds. Plaintiff

7  seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging

8  all payments, commissions, profits, benefits, year-end performance or other bonuses, and other

9  compensation obtained by Defendants, and each of them, from their wrongful conduct. Plaintiff

10  also seeks costs of suit and other pecuniary loss in an amount to be proven at trial.

11      WHEREFORE, Plaintiff prays for relief as set forth below.

12  

**THIRD CAUSE OF ACTION**
**Rescission**

13  **(*Against All Defendants*)**

14      62.    Plaintiff realleges and incorporates by reference the allegations contained in

15  Paragraphs 1 through 61 as though fully set forth herein.

16      63.    Civil Code Section 1689(a) permits a party to a contract to rescind a contract by

17  mutual agreement.

18      64.    On or before April 1, 2020, Plaintiff and Defendants consented and agreed that

19  the Expansion Service Order for ■ new cabinets to be installed by Plaintiff at the Santa Clara

20  facility beginning on April 1, 2020 was to be, and was, rescinded. The parties further agreed that

21  they would enter into a different agreement for a lesser number of cabinets at a later start date.

22      65.    Because the Expansion Service Order was mutually rescinded by the parties at

23  any stage of its performance or before any performance had commenced, the promise by one

24  party to forgo its rights under the contract was sufficient consideration for the promise of the

25  other party to also forgo its rights. By such rescission of the Expansion Service Order, each

26  party was released from any further performance or any performance at all under the Expansion

27  Service Order.

28

66.     After Plaintiff communicated its desire to rescind the original ▮-cabinet
Expansion Service Order, Defendants' agents, employees, and representatives provided repeated
assurances to Plaintiff, both orally and in writing, that the original order would be canceled and
superseded by a new, revised Service Order for a smaller number of cabinets to become available
at Digital Realty's premises on a modified schedule.  In making these repeated assurances,
Defendants acknowledged and ratified the parties' mutual rescission of the Expansion Service
Order, which, per Commercial Code § 10208, also amounted to a waiver of any contractual
requirement that any rescission of the leasehold be executed in writing.

67.     Plaintiff relied upon the repeated assurances that the Expansion Service Order
was mutually rescinded by materially changing its position by forbearing on seeking legal
remedies, including while monthly charges continued to accrue after April 1, 2020.  When
Plaintiff raised these issues and demanded that the charges be reversed because the Expansion
Service Order had been rescinded by agreement with Digital Realty's representatives, Plaintiff
was repeatedly told by Digital Realty's agents and authorized representatives that such charges
would be reversed.  Plaintiff relied on these oral and written assurances by acting in forbearance
on pursuing legal remedies and materially changing its position on the assurances provided by
Defendants.  Months later, Defendants later took the inconsistent position that the agreement had
not been rescinded and demanded immediate payment of all amounts due under the rescinded
Expansion Service Order, which Plaintiff was forced to pay in November 2021 under duress and
under protest for the safety of its employees and the general public.

68.     By operation of law, Plaintiff is entitled to rescind the agreement, as originally
agreed, and receive a refund of all payments made under the rescinded Expansion Service Order.
In addition, Plaintiff is entitled to all other compensatory relief available to it for Defendants'
failure to honor the mutual rescission previously agreed by the parties.  Such relief includes but
is not limited to attorney's fees and costs of suit.

WHEREFORE, Plaintiff prays for relief as set forth below.

//

//

**FOURTH CAUSE OF ACTION**
**Breach of Covenant of Good Faith and Fair Dealing**
(*Against All Defendants*)

69.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 68 as though fully set forth herein.

70.    Implied in every contract or agreement is a promise of good faith and fair dealing. This means that each party agrees not to do anything to unfairly interfere with the right of the other party to receive the benefits of the agreement and to refrain from taking actions that will injure the right of the other party to receive the benefits of the contract.

71.    In refusing to process Plaintiff's request to cancel the Expansion Service Order in early 2020, Defendant breached the implied covenant of good faith and fair dealing and prevented Plaintiff from receiving the benefits of the Master Agreement.

72.    As a direct and proximate result of Defendant's breach of the covenant of good faith and fair dealing, Plaintiff has suffered, and will continue to suffer, compensatory and special damages in an amount to be determined at trial that include, but are not limited to, improper charges under the Expansion Service Order that Plaintiff attempted to cancel and the resulting costs and expenses.

73.    As a further direct and proximate result of the breaches by Defendants, Plaintiff is entitled to recover attorneys' fees and other enforcement costs incurred in connection with this action.

WHEREFORE, Plaintiff prays for relief as set forth below.

**FIFTH CAUSE OF ACTION**
**Conversion**
(*Against All Defendants*)

74.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 73 as though fully set forth herein.

75.    By the conduct pleaded above, Defendant has wrongfully exercised control over personal property owned by Plaintiff, specifically the amounts that Plaintiff paid to Defendants under duress and under protest in November 2021 for improper amounts charged to Plaintiff under the Expansion Service Order.

76.     Plaintiff has a right to possess all funds improperly paid to Defendants and/or improperly retained by Defendants, including but not limited to the amounts paid under duress and under protest in November 2021.  Defendants' assertion of dominion and control over these funds is inconsistent with Plaintiff's right to immediate possession of its funds and has deprived Plaintiff of the amounts previously paid in protest.  In doing so, Defendants have converted these funds.

77.     As a result of Defendants' unlawful conversion of the amounts paid under duress and under protest in November 2021, Plaintiff has suffered and continues to suffer damages.

78.     Plaintiff did not consent to the Defendants' retention of the funds that Plaintiff paid in protest to avoid irreparable harm in November 2021, and Plaintiff conspicuously delivered such payment to Defendants under clear protest in accordance with Commercial Code § 1308(a).

79.     Pursuant to California Civil Code § 3336, Plaintiff seeks interest since the time that the payment described above was converted by Defendants, with such amount to be determined at trial.

80.     As Plaintiff was also forced to expend time and resources attempting to recover the specific sums described above, and thus seeks reasonable compensation for the time and money spent in an amount to be determined at trial.

81.     Because Defendants' fraudulent conduct was done maliciously, oppressively, deliberately, and/or with intent to defraud, Plaintiff is further entitled to an award of exemplary and punitive damages, pursuant to California Civil Code section 3294.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SIXTH CAUSE OF ACTION
### Common Count for Money Had and Received
### (*Against All Defendants*)

82.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 81 as though fully set forth herein.

83.     The Defendants received money belonging to Plaintiff in the form of the payment

it made to Defendants under duress and under protest in November 2021 for disputed amounts

allegedly due under the Expansion Service Order.

84.    The Defendants benefitted from the receipt of this payment.

85.    Under principles of equity and good conscience, Defendants should not be

permitted to keep this payment.

WHEREFORE, Plaintiff prays for relief as set forth below.

**SEVENTH CAUSE OF ACTION**
**Promissory Estoppel**
(***Against All Defendants***)

86.    Plaintiff realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 85 as though fully set forth herein.

87.    Defendants made clear and unambiguous promises to Plaintiff to process its

cancellation request for the Expansion Service Order; to cancel the Expansion Service Order; to

rescind the Expansion Service Order; to reverse and remove charges being incurred after April 1,

2020 under the canceled Expansion Service Order; and to promptly execute a subsequent

agreement for a smaller number of cabinets with a later start date that would supersede the prior

Expansion Service Order.

88.    Defendants failed to honor these promises and, in doing so, materially breached

these various commitments made to Plaintiff.

89.    Plaintiff reasonably relied on these promises to their detriment in the following

ways: by not seeking immediate judicial relief against Defendants before the first delivery date

under the Expansion Service Order; by forbearing to send a dispute notice under the Master

Agreement that would have allowed for early termination; by not paying amounts charged under

the Expansion Service Order that they were assured would be canceled and reversed and as a

result incurring interest and penalties; by paying disputed charges, including improper late fees

and penalties, under duress and under protest in November 2021 to avoid irreparable harm; and

by continuing to negotiate a smaller expansion agreement with Digital Realty on the expectation

that all improperly charged amounts would be reversed and all obligations would be superseded

by a subsequent Service Order.

90.     Plaintiff's reliance on the promises stated above was a substantial factor in causing it harm. Had Defendants not made these promises, Plaintiff would not have waited for charges and late fees to mount for services it intended to cancel under the Expansion Service Order and also would not have been forced to pay the amounts it paid under duress and under protest in November 2021 to avoid irreparable harm.

91.     Each Defendant was aware of and/or approved false promises issued by or on behalf of Defendants.

92.     As a proximate result of the Defendants' wrongful conduct, Plaintiff has sustained and will sustain substantial economic losses and other general and specific damages.

WHEREFORE, Plaintiff prays for relief as set forth below.

## EIGHTH CAUSE OF ACTION
### Breach of Contract - Accord & Satisfaction
### (*Against All Defendants*)

93.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 92 as though fully set forth herein.

94.     After executing the Expansion Service Order for a ██-cabinet expansion in late 2019, Plaintiff and Defendants — in recognition of the changed circumstances and unforeseen economic difficulties presented by the COVID-19 pandemic that emerged in early 2020 and the existence of a bona fide dispute as to whether the original Expansion Service Order had been canceled — subsequently entered into oral and written agreements whereby Plaintiff agreed to give, and Defendants agreed to accept, something different from or less that that to which Defendants were entitled to under the preexisting Expansion Service Order, specifically, to wit, a revised Service Order for a lesser number of cabinets to become available to Plaintiff in late 2020.  These agreements each amounted to an accord under Civil Code § 1521.

95.     Plaintiff accepted the offer of the accord and satisfaction and subsequently executed a revised Service Order for a lesser number of cabinets in or about December 2020 that superseded the original Expansion Service Order and, under the terms agreed with Defendants,

satisfied any liability to Defendants under the Expansion Service Order.

96.    Plaintiff has fulfilled all conditions, if any, to the filing of this action, and all conditions, if any, in seeking to enforce the accord and satisfaction agreement have been performed or have occurred.

97.    All requirements for an order of specific performance to compel Defendants to acknowledge that any preexisting debt owed by Plaintiff relating to the Expansion Service Order has been met under Civil Code § 3391, and Plaintiff is entitled to an order compelling Defendants to perform its part of the accord and acknowledge that Plaintiff's pre-existing debt relating to the Expansion Service Order has been satisfied by execution of the December 2020 Service Order.  The consideration exchanged under this accord was adequate in that Plaintiff disputed the enforceability of the Expansion Service Order, the frustration of its purpose, and also the extension of the contract term under the Master Agreement from 24 months to 36 months when it first executed the Expansion Service Order.  As to Defendants, the accord is just and reasonable as to them, especially in light of their conduct throughout the dispute and their receipt of substantial remuneration to be provided under the December 2020 Service Order. Plaintiff has no adequate remedy at law in that Defendants keep attempting to enforce the terms of the original Expansion Service Order, notwithstanding the fact that Plaintiff's liability to them has been extinguished by the accord and satisfaction.

98.    In addition to an order of specific performance, Plaintiff is entitled to breach of contract damages in an amount to be proven at trial for Defendants' breaches of the accord agreement and its subsequent attempts to collect on the original Expansion Service Order.

99.    As a direct and proximate result of Defendants' breach of the accord and satisfaction agreement, Plaintiff has suffered damages in an amount to be proven at trial.

100.    Plaintiff is further entitled to a refund of any amounts previously overpaid by Plaintiff in an amount to be proven at trial, including, but not limited to, all amounts paid under duress and under protest in November 2021.

101.    Plaintiff is also entitled to prejudgment interest on all such breach of contract damages in an amount to be determined at trial, running from the time that each breach occurred,

1   at the applicable statutory rate.

2       102.   Moreover, pursuant to the Master Agreement and the December 2020 Service

3   Order, Plaintiff is also entitled to reasonable costs of collection and attorney's fees.

4       WHEREFORE, Plaintiff prays for relief as set forth below.

### NINTH CAUSE OF ACTION
**Violations of Business & Professions Code §§ 17200 *et. seq.***
**(*Against All Defendants*)**

7       103.   Plaintiff realleges and incorporates by reference the allegations contained in

8   Paragraphs 1 through 102 as though fully set forth herein.

9       104.   California's Unfair Competition Law ("UCL"), as codified in California Business

10   & Professions Code § 17200 et seq. prohibits "any unlawful, unfair or fraudulent business act or

11   practice." Cal. Bus. & Prof. Code § 17200. The statutory violations, fraudulent

12   misrepresentations and unlawful practices and acts of Defendants, and each of them, mentioned

13   previously, constitute unfair, unlawful, and/or fraudulent business acts and/or practices within

14   the meaning of the UCL.

15       105.   Plaintiffs alleges that by engaging in the above-described acts and/or practices as

16   alleged herein, Defendants, and each of them, have violated several laws and/or regulations

17   constituting per se violations of Section 17200 *et. seq*. These predicate unlawful business acts

18   and/or practices include Defendants' violation of Civil Code § 1671(b) through the improper

19   assessment of a ▮▮▮▮▮ late penalty on all monthly recurring charges that are not paid

20   within ▮▮▮▮ of when due.

21       106.   Defendant's late fee under Digital Realty's Master Agreement is an unlawful

22   liquidated damages penalty under Civil Code § 1671(b) because it was unreasonable under the

23   circumstances existing at the time the contract was made. It would not have been impracticable

24   or extremely difficult to fix the actual damages caused by any delay in payment (which certainly

25   would not have amounted to a monthly ▮ penalty equivalent to an annualized percentage rate

26   in excess of ▮▮ ); the amount of the ▮▮ monthly late fee does not represent the result of a

27   reasonable endeavor by Defendants to estimate a fair compensation for any loss that may be

1  sustained; and the ▮ monthly late fee is designed to overreach and substantially exceed any

2  damages or costs to Digital Realty in the event of any delay in payment.

3        107.   Defendants' practices with respect to the ▮ late fee constitute unlawful, unfair,

4  and fraudulent business acts and/or practices because such charges constitute unfair and

5  wrongful penalties inconsistent with Cal. Civil Code § 1671(b); such charges were assessed

6  pursuant to contracts of adhesion; (c) the practice is oppressive, unscrupulous, or substantially

7  injurious to consumers; and (d) the utility of the ▮ late fee is significantly outweighed by the

8  gravity of the harm it imposes on Plaintiff.  As such, this practice constitutes unfair competition

9  under the UCL.

10       108.   All of Defendants' unlawful, fraudulent and unfair conduct, each of them,

11  occurred in Defendants' general course of business as part of Defendants' general course of

12  conduct.  Each Defendant was aware of and/or approved of the unlawful, fraudulent and unfair

13  statements issued by or on behalf of Defendants.

14       109.   As a direct and proximate result of Defendants' conduct, each of them, Plaintiff

15  Pony.ai has suffered injury.

16       110.   Plaintiff brings this Cause of Action on behalf of itself and the public as a private

17  attorney general pursuant to Business and Professions Code § 17204.

18       111.   Pursuant to Business and Professions Code § 17203, Plaintiff seeks from

19  Defendants, and each of them, restitution and disgorgement of all earnings, profits,

20  compensation, benefits, and other gains wrongfully obtained by Defendants as a result of

21  Defendants' conduct in violation of Business and Professions Code § 17200 et seq. Plaintiff also

22  seeks reasonable attorneys' fees and costs under applicable law, including California Code of

23  Civil Procedure section 1021.5.

24       112.   Pursuant to Business and Professions Code § 17204, Plaintiff seeks an order from

25  the Court enjoining Defendants, each of them, from continuing to engage in the acts set forth in

26  this complaint, which acts constitute violations of Business and Professions Code § 17200 et seq.

27       WHEREFORE, Plaintiffs prays for relief as set forth below.

28

PLAINTIFF'S COMPLAINT FOR DAMAGES
24

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

1.    For compensatory damages in an amount to be proven at trial;

2.    For statutory damages, restitution, disgorgement, and/or other equitable relief according to proof and as the Court deems proper;

3.    For the declaratory relief requested herein, including a declaration that establishes, among other things, the following:

    a.    The Expansion Service Order was rescinded by mutual agreement;

    b.    Under the doctrines of frustration of purpose and commercial impracticability, Plaintiff was excused from performance under the Expansion Service Order and was entitled to rescission when it communicated its desire to cancel the Expansion Service Order before April 1, 2020;

    c.    Plaintiff was not in breach of its agreement with Digital Realty for withholding payment of the amounts charged to it pursuant to the Expansion Service Order, in addition to all late fees and penalties assessed thereto;

    d.    The Expansion Service Order was extinguished by accord and satisfaction because Digital Realty agreed to accept, in lieu of and in satisfaction of the Expansion Service Order, a modified expansion order of fewer cabinets (█ instead of █) with a later start-date (February 2021);

    e.    That Plaintiff owes nothing to Digital Realty pursuant to the Expansion Service Order;

    f.    That the amounts Plaintiff previously paid under protest to Defendants in November 2021 were paid involuntarily under duress, coercion, and/or compulsion; such payment was made under protest in order to protect Plaintiff's property and business interests, even though the amount paid was not owed; and under principles of equity and good conscience, Defendants should not retain the amounts previously paid under protest, which should be refunded to Plaintiff;

    g.    The terms of the Master Agreement imposes an unlawful late fee of 3%

1   per month on all monthly recurring charges that are not paid within 15 days when due, which is

2   an invalid penalty provision under Civil Code § 1671(b);

3           h.      That Defendants failed to mitigate any alleged damages caused by

4   Plaintiff's refusal to pay disputed amounts under Expansion Service Order; that Defendants

5   failed to do everything reasonably possible to minimize any resulting loss to it or to reduce any

6   damages for which it believed Plaintiff was liable; and that Defendants failed to act reasonably,

7   with due diligence, and in good faith toward Plaintiff in mitigating any alleged damages; and

8   that, as a result, Defendants are not entitled to compensation for any alleged damages that they

9   could have avoided by their reasonable efforts and without undue expense; and

10          i.      That the Master Agreement was properly terminated by Plaintiff pursuant

11  to the terms of the Master Agreement, and Plaintiff owes no further amounts to Digital Realty

12  under the Master Agreement or any service orders

13      4.      For exemplary or punitive damages in an amount to be proven at trial;

14      5.      For prejudgment interest as permitted by law;

15      6.      For cost of the suit, including attorneys fees; and

16      7.      For such further and other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all triable issues.

Dated: September 22, 2022                    Respectfully submitted,

                                             MOYA LAW FIRM

                                             */s/ Mario A. Moya*
                                             Mario A. Moya
                                             Rebecca M. Hoberg

                                             Attorneys for Plaintiff
                                             PONY.AI, INC.